In re Estate of Magdaline Vinces, Deceased.
Petition of Anna Spogis, Administratrix of Said
Estate, Petitioner and Appellant, v. William
Vinces, Respondent and Appellee.

Gen. No. 35,777.

Opinion filed October 4, 1932. Rehearing denied October 15, 1932.

CECIL SMITH and JOHN B. FRUCHTL, for appellant.

PINES, MORSE & STEIN and JOHN B. BORDEN, for appellee; CLARENCE T. MORSE, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

On April 22, 1926, Magdaline Vinces died intestate in Cook county, Illinois. More than three years thereafter, on January 9, 1930, Anna Spogis, her daughter, was by the probate court of Cook county duly appointed administratrix of Mrs. Vinces' estate, and on June 5, 1930, she, as such administratrix, filed in said court her amended petition under oath, praying that a citation issue directing William Vinces (husband of Mrs. Vinces during her lifetime) to appear "to be questioned concerning the location and disposition of the mortgage of Peter J. Neuman and wife," belonging to said estate, and praying that the mortgage "be decreed to be the property of the estate to be distributed among her (Mrs. Vinces') heirs-at-law and next of kin," etc. The petition was filed under and by virtue of sections 81 and 82, as amended in 1925, of the Administration Act. (Cahill's St. 1931, ch. 3, ¶¶ 82, 83.) On July 2, 1930, William Vinces filed his answer, and during March, 1931, there was a trial before a jury resulting in a verdict in favor of petitioner. On March 14, 1931, the court entered judgment on the verdict and ordered that respondent, William Vinces, deliver to Mrs. Spogis, as administratrix, "the two first mortgage real estate gold bonds, Nos. 33 and 34 respectively, each in the sum of $2,000,

executed by Peter J. Neuman and wife, dated January 3, 1928, together with all interest coupons due on or after January 1, 1930." From the order or judgment respondent prayed an appeal to the circuit court which was allowed upon his filing a bond in the sum of $4,500 within 20 days, or, in the alternative, delivering the two Neuman bonds and the interest coupons to the clerk of the probate court and filing a cost bond in the sum of $250. Respondent elected to file, and filed within apt time, the cost bond and delivered the Neuman bonds and coupons to the clerk "the same to be held by said clerk to abide the final determination of said cause upon appeal to the circuit court." On November 18, 1931, upon the cause being called for a trial *de novo* in the circuit court, *respondent* moved that the petition of the administratrix and all proceedings thereon be dismissed for "want of jurisdiction" of the probate court. After arguments the circuit court granted the motion and entered an order that the petition and proceedings be dismissed "at the cost of the petitioner, to be paid to the respondent, William Vinces, in due course of administration." In the order the court found that the petition "does not state a cause of action cognizable by said probate court, that said court was and is without jurisdiction in the premises to grant any relief upon said petition, and that the judgment and order upon said petition heretofore entered in the probate court is void for want of jurisdiction in said court." From the order or judgment petitioner has appealed to this court.

The sole question for our determination is whether the circuit court erred in dismissing petitioner's petition and all proceedings thereunder for want of jurisdiction in the probate court.

In the amended petition of Anna Spogis, administratrix, etc., as filed in the probate court, it is alleged

in substance that in April, 1923, Magdaline Vinces, having received certain money, directed Peter Spogis, her son-in-law and the husband of Anna Spogis, to invest the sum of about $4,000 "in mortgages for her"; that during that month Spogis purchased for $4,046.67, "a first mortgage on the property of James and Ellen Montgomery, consisting of 3 notes of $250, $500 and $3,250, maturing respectively in February, 1926, 1927 and 1928" (hereinafter called the Montgomery mortgage); that after the death of Mrs. Vinces, which occurred in April, 1926, the Montgomery mortgage was fully paid during February, 1928; that with the funds received by said payment Spogis, during February, 1928, purchased for the sum of $4,025.33, another mortgage on the property of Peter J. Neuman and wife (hereinafter called the Neuman mortgage); that thereafter William Vinces and Anna Spogis executed a written instrument and delivered the same to the Drovers Trust and Savings Bank of Chicago, by which instrument they agreed that the Neuman mortgage "should be held by them as joint tenants and not as tenants in common"; that thereafter, about January 3, 1930, William Vinces "attempted to cancel said joint tenancy agreement by a letter" addressed to said bank; that until about November 1, 1928, the Neuman bonds and mortgage were kept by Peter Spogis in his safety deposit box at said bank; that about November 1, 1928, William Vinces "expressed a desire to hold the Neuman mortgage"; that upon his request, "and without knowledge of his intention to convert or attempt to convert the same to his own use, and without knowledge of the rights of the heirs of Magdaline Vinces," Peter Spogis transferred the custody of the Neuman bonds and mortgage to William Vinces; that those papers, "at the verbal direction of this (probate) court," are now being held by the counsel of William Vinces pending the court's

decision herein; that the Neuman bonds and mortgage belong to the estate of Magdaline Vinces; that about January 22, 1924, and during her lifetime, Magdaline Vinces rented a safety deposit box and for a time there kept in her custody the Montgomery notes and mortgage; and that on August 14, 1924, she delivered those papers back to Peter Spogis to be deposited in his safety deposit box.

In the verified answer of William Vinces (respondent) to the petition, he alleged *inter alia* that Anna Spogis is his daughter; that of the children born to him and Magdaline Vinces there are now living four adult children, viz., Anna (wife of Peter Spogis), William, Jr., Joseph and Petronela; that after the purchase of the Montgomery notes and mortgage in April, 1923, Magdaline gave the papers to Peter Spogis "for safekeeping," and Spogis kept them for her in his safety deposit box; that thereafter certain maturing interest coupons were collected by Spogis and the proceeds paid to her; that early in 1924, William, Jr. and Joseph stated to respondent and his wife that it was not safe to leave the possession of the Montgomery papers in Spogis' hands; that thereupon Magdaline demanded and received said papers from Spogis, and she put them in *her* safety deposit box in another bank; that thereafter respondent and Magdaline together went to live at the home of Peter and Anna Spogis; that thereafter in 1926, Magdaline, while lying in bed at said home in her last illness, "delivered said mortgage and notes and all other papers relating thereto to respondent"; that at that time she stated to respondent that she "realized she could not live" and that she "wanted respondent, her husband, to have her property"; that she then further stated: "Take this mortgage and keep it; you will need it; you are old and cannot work; the children . . . can make their living easier than you"; that thereupon

respondent took the notes, mortgage and other papers and "placed them in his trunk," where they were when Magdaline died about two weeks later; that shortly thereafter respondent gave said papers to Peter Spogis "for safekeeping" for him; that whenever interest coupons became due Spogis was authorized to collect the proceeds, and did so, and was requested by respondent to put said proceeds in his (Spogis') safety box, which Spogis promised to do; that when the notes and mortgage were fully paid in February, 1928, Spogis, at respondent's request and acting as his agent, purchased the Neuman bonds and mortgage now in controversy, and the same "are now the sole property of respondent"; that respondent has no recollection of ever having executed any writing whereby he agreed that the two Neuman bonds should be the *joint* property of himself and Anna Spogis; that if his signature is upon any such paper it was procured by fraud; that after the death of Magdaline, respondent continued to live for several years at the home of Peter and Anna Spogis; that he frequently requested of Spogis an accounting of certain interest collected by him on the Montgomery notes and mortgage, which accounting was refused; that on one occasion, when respondent demanded such an accounting, Spogis stated that he did not owe respondent anything for interest money collected and "threatened to kill" respondent if any such further demands were made upon him; that Anna Spogis claimed at the time that all collected interest had been given to respondent but that he had forgotten about it; that about November 1, 1928, Spogis, at respondent's request, delivered the two Neuman bonds and mortgage papers to respondent, and ordered respondent to immediately leave the Spogis home; that respondent did so and has ever since had possession of the two bonds and the mortgage papers; that about January 3,

1930, respondent was informed that Anna Spogis was going to take some proceedings "in the attempt to divest him of his title to said mortgage bonds" and that she "was claiming that he had executed some paper at the bank," whereby he had acknowledged that said bonds were the *joint* property of herself and respondent; that respondent immediately went to the bank and there signed a writing "disavowing any such joint ownership," and instructed said bank to disregard any such claim on the part of Anna Spogis; that thereafter on January 9, 1930, Anna Spogis caused herself to be appointed administratrix of the estate of Magdaline Vinces, and thereafter in the probate court commenced the present proceeding. And respondent denied that the two Neuman bonds and the mortgage papers are the property of said estate, and alleged the fact to be that they are respondent's sole property.

Sections 81 and 82, as amended in 1925, of chapter 3 of our statutes (Cahill's St. 1931, p. 64, ¶¶ 82, 83) are as follows:

"§ 81. If any executor or administrator, or other person interested in any estate, shall state upon oath, to any county or *probate* court, that he believes that any person has in his possession *or control,* or has concealed, *converted,* or embezzled, any goods, chattels, moneys or effects, books of accounts, papers or any evidences of debt whatever, or titles to lands belonging to any deceased person, *or the executor or administrator, or the estate of any deceased person.* . . . the court shall require such person to appear before it by citation and may examine him on oath, and hear the testimony of such executor or administrator, and other evidence offered by either party, and make such order in the premises as the case may require. *The court shall have power to hear, settle and adjudge all controverted questions of title and claims*

*of adverse title and to determine the right of property. Such questions of title and of rights of property, and such claims of adverse title shall be determined, upon the demand of either party, by a trial by jury.*

"§ 82. If such person refuses to answer such proper interrogatories as may be propounded to him, or refuses to deliver up such property or effects, or in case the same has been converted, the proceeds or value thereof, upon a requisition being made for that purpose by an order of the said court, such court may commit such person to jail until he shall comply with the order of the court therein, *and if such order is for the delivery of such property or effects the court may enforce such order by execution against the real and personal property of the person thus ordered. With respect to property and effects concerning which there is raised a question of title, or of the right of property, or claim of adverse title, the court shall (upon trial by jury as provided in the preceding section, if such trial is demanded) enter a judgment according to the right of the matter and enforce the same by execution against the real and personal property of the person against whom such judgment is rendered, or the court may enforce its judgment and order in the premises by proceedings in contempt against any of the parties to said proceedings.*"

The amendments to said sections, as made by the amendatory act of 1925, are above indicated by italics. (See Cahill's St. 1923, p. 86.) In the opinion of *Johnson v. Nelson*, 341 Ill. 119, 122, the sections, as they existed prior to said amendatory act, are set out in full. In commenting upon their force and effect and upon decisions construing them, our Supreme Court said in the *Johnson* case (p. 122):

"These sections provided a summary method for the recovery of property of the character defined in section 81, which belonged to a decedent at the time

of his death but had come into the possession of a third party prior thereto, and which that party either retained in his possession or had concealed or embezzled. (*Dinsmoor v. Bressler,* 164 Ill. 211.) In a case where the decedent's ownership of the property in his lifetime was not disputed, the court might order the respondent, by the authority of sections 81 and 82, to deliver the property, or if he had converted it, the proceeds or value of the property, to the executor or administrator. If, however, the respondent claimed to be the owner of the property sought to be recovered, these sections could not be invoked against him, because he had the constitutional right to a jury trial for the determination of the question of the title to the property, and these sections made no provision for such a trial. Nor were these sections designed to afford the means of collecting a debt owing to the decedent at the time of his death. The title to the goods sold or the money lent, in such a case, had passed to the debtor or borrower, and sections 81 and 82 were not available to obtain satisfaction of the debt or claim. To accomplish that end the personal representative was compelled to institute, in a court of competent jurisdiction, a plenary action wherein the defendant had the right to a trial by jury. *Martin v. Martin,* 170 Ill. 18; *Sullivan v. Arcola State Bank,* 314 id. 40.''

And in the *Johnson* case, after referring to said sections, *as amended,* the court further said (p. 123):

''The amendatory act made additions to both sections. The additions to section 81 by interpolation are: (1) The statement upon oath by which the proceeding is instituted may be made to the probate court as well as the county court; (2) the respondent's possession or control, as distinguished from his possession merely, and his conversion as well as concealment or embezzlement of the property sought, may be the subject of inquiry, and (3) the property for the re-

covery of which the proceeding may be brought and the knowledge or information desired may concern property belonging not only to 'any deceased person' but also 'to the executor or administrator or the estate of any deceased person.' "

And, after quoting the clauses added by the amendatory act to the sections respectively (as above indicated by italics), the court further said (pp. 124, 125):

"The amendments to section 81 enlarged its provisions to include property belonging to 'the executor or administrator or the estate of any deceased person' and conferred upon the court the power to determine, upon a trial by jury if demanded by either party, questions of title and rights of property. Notwithstanding these additions, the purpose of the section as amended, apart from the recovery of books of account, papers or instruments of title, and the obtaining of information, is to recover possession of specific property, or, if converted, its proceeds or value. Section 81, as now in effect, contemplates that the testate or intestate, at the time of his death, held or at least claimed, and that the executor of his will or the administrator of his estate, since his death, either in succession or initially, holds or claims, the title to the property of which possession is sought.

"The power to determine questions of title and rights of property and to enforce by execution orders adjudicating titles or requiring the delivery of property, added to sections 81 and 82 by the amendatory act, does not include jurisdiction of the ordinary action for the recovery of money the title to which is in the debtor. Where the relation of debtor and creditor arises for money lent, the debtor owns the money and is indebted to the creditor for it, and consequently the debtor has no money belonging to the creditor, or to the latter's estate, in his possession. To enforce collection of the indebtedness in such a case, by the rendi-

tion of a personal judgment against the debtor, was not within the scope of sections 81 and 82 prior to July 1, 1925, and no such power was conferred by the amendatory act, either expressly or by implication.''

In the more recent case of *Hansen v. Swartz,* 345 Ill. 609, wherein the construction of sections 81 and 82, as amended, was involved, it was decided *inter alia* that in a proceeding under the sections the trial in the circuit court is *de novo,* and that if either party demands a jury trial it should be allowed. In the course of the opinion the court said (p. 613):

''Sections 81 and 82 of the Administration act before their amendment in 1925 created a right of reaching property which had been placed by the deceased in his lifetime in the possession of the party charged, and the remedy did not extend to the determination of a contested right or title to the property because no provision was made for the trial by jury, without which no man can be deprived, constitutionally, of his property. (Citing cases.) By the amendment (Laws of 1925, pp. 1, 2), the remedy was extended to property belonging to the 'executor or administrator of the estate of any deceased person,' and power was conferred on the court to determine 'all controverted questions of title and claims of adverse title and to determine the right of property' by a trial by jury upon the demand of either party. (*Johnson v. Nelson,* 341 Ill. 119.) This remedy is not, however, applicable to the collection of a debt. (*Johnson v. Nelson, supra; Sullivan v. Arcola State Bank,* 314 Ill. 40.)''

After reviewing the pleadings in the present proceeding and sections 81 and 82, as amended, of the Administration Act, and considering the above holdings of our Supreme Court construing said sections, we are of the opinion that, on the cause coming on for trial *de novo,* the circuit court erred in dismissing petitioner's petition and all proceedings thereunder for

want of jurisdiction in the probate court. It appears from the petition of Mrs. Spogis, as administratrix of Mrs. Vinces' estate, and from respondent's answer thereto, that the controversy concerned the title or ownership of certain *specific property,* viz., two bonds and a mortgage securing them; that petitioner claimed that the property belonged to said estate; and that respondent on the contrary claimed he was the owner thereof. It further appears that on this issue of fact there was a trial before a jury in the probate court, resulting in a verdict in favor of petitioner, upon which verdict the court entered judgment and ordered that respondent deliver the property to petitioner, as administratrix; that respondent took proper steps to have the issue tried *de novo* before the circuit court; and that the circuit court found that the petition "does not state a cause of action cognizable by the probate court" and that the probate court "was and is without jurisdiction to grant any relief upon the petition," and, accordingly, entered the order or judgment now in question. In said section 81, as amended, it is provided in part that the probate court "shall have power to hear, settle and adjudge all controverted questions of title and claims of adverse title and to determine the right of property." And it is also provided in the section that all such questions and claims "shall be determined, upon the demand of either party, by a trial by jury." We think that the pleadings in the present case disclose such a case as by said section, as amended, the probate court is given power to hear, settle and determine. And we do not think that the decision in the above referred to *Johnson* case (341 Ill. 119, 125) is in anywise contrary to this view, as is here urged by respondent's counsel. In the *Johnson* case, as in said *Hansen* case (345 Ill. 609, 613), it was held that the remedy given by the amended statute is not applicable to the collection of a debt. In the present proceeding the petitioner, as administratrix, does

not seek to collect a debt due to the estate, but does seek to obtain possession of certain *specific property,* alleged to belong to the estate.

The order or judgment of the circuit court of November 18, 1931, appealed from is reversed, and the cause is remanded to the circuit court for a trial *de novo* upon the petition and answer. If either party demands a jury trial it should be allowed.

*Reversed and remanded.*

KERNER, P. J., and SCANLAN, J., concur.